{¶ 27} I concur with the majority's disposition of defendant's first assignment of error. I dissent, however, from the majority's analysis of and ruling on defendant's second assignment of error, for the reasons that follow.
 {¶ 28} In his second assignment, defendant argues that the trial court erred when it denied his Crim.R. 29 motion for acquittal. Specifically, defendant claims that the state failed to produce sufficient evidence to prove that he entered the O'Mearas' home with the intent to commit a crime.
 {¶ 29} The majority concludes that "the record contains a reasonable inference that [defendant] entered the home with the intent to commit a theft." Ante, 9. The majority, however, fails to consider the type of evidence the state had to present to establish defendant's intent to commit a crime.
 {¶ 30} The state was required to establish beyond a reasonable doubt that defendant trespassed into the O'Meara home with purpose to commit a crime therein. "A person acts purposely when it is his specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is his specific intention to engage in conduct of that nature." R.C. 2901.22(A).
 {¶ 31} The Notes to R.C. 2901.22 explain the term "purposely" means "intentionally," "willfully," or "deliberately." See, 1974 Advisory Committee Notes to R.C. 2901.22. "Intent cannot normally, if ever, be demonstrated by direct testimony. State v.Huffman (1936), 131 Ohio St. 27, 1 N.E.2d 313. Because intent exists in a person's mind, it must be determined by the surrounding facts and circumstances." State v. Hillman,
Franklin App. Nos. 00AP-729 and 00AP-756, 2001 Ohio App. LEXIS 637, *9, citing Huffman.
 {¶ 32} In a Franklin County case regarding burglary, the Tenth Appellate District analyzed a set of circumstances in which it found no intent to commit theft. In that case, the court explained the intent element of burglary as follows:
Intent cannot normally, if ever, be demonstrated by direct testimony. State v. Huffman (1936), 131 Ohio St. 27,1 N.E.2d 313. Because intent exists in a person's mind, it must be determined by the surrounding facts and circumstances. Id. This court has determined that "there is a reasonable inference that one who forcibly enters a dwelling * * * does so with the intent to commit a theft offense in the absence of circumstances giving rise to a different inference." State v. Flowers (1984),16 Ohio App.3d 313, 315, 475 N.E.2d 790, overruled on other grounds,State v. Fontes (2000), 87 Ohio St.3d 527, 721 N.E.2d 1037.
In Flowers, the defendant entered a basement level bedroom through a window. James Linderman and his girlfriend, Betty Weaver, were occupying the bedroom at the time. When Linderman asked what Flowers was doing, Flowers indicated he had dropped some money into the basement. Linderman told Flowers to leave, and went for assistance. When Flowers pulled the sheets down that had fully concealed Weaver, she screamed and Flowers left.
From these facts the court found "no reasonable inference that defendant's entry into the basement was for an innocent purpose."16 Ohio App.3d at 315. Indeed, although Flowers said he had dropped some money, the court found it "highly improbable that he could have done so prior to his forcible entry into the basement," given the nature of the window by which Flowers entered the dwelling. Id. Because the circumstances did not give rise to a different inference, the court determined the evidence gave rise to a reasonable inference of intent to commit a theft offense. The court further noted that defendant's claim to be looking for money indicated that money was foremost on his mind and supported the conclusion that defendant intended to commit a theft offense.
The facts and circumstances here do not support the inference entertained in Flowers. Initially, nothing was taken from Korting's basement. Moreover, the evidence does not suggest defendant even searched for something of value. Indeed, Korting's testimony and the 911 audiotape indicate defendant was inside Korting's basement for less than fifteen seconds. Most significantly, defendant left of his own will with nothing taken from the house. Given defendant's brief tenure inside the basement, the lack of any evidence that defendant attempted to secure a thing of value for his own, and defendant's leaving the basement not as a result of confrontation as in Flowers but on his own accord, the evidence is insufficient to sustain defendant's R.C. 2911.12(A)(2) conviction.
Hillman, supra, *8-*10.[2]
 {¶ 33} In the case at bar, even though the State's case centered exclusively on its theory that defendant intended to rape Mrs. O'Meara, rather than to commit theft, the majority nonetheless ignores the State's rape theory and concludes defendant intended to commit a theft. That the majority finds the alleged crime so different from the theory the prosecutor pursued indicates the inconclusive nature of the evidence.
 {¶ 34} Citing select portions of the record, the majority makes the following observations:
Powers entered [the O'Meara] home, uninvited, that he was seen standing in the entrance to the home at 4:30 a.m. when confronted by Mrs. O'Meara, and that he ran away from the home only after the O'Mearas' dog began barking. (Tr. 18-33; 54.) Further testimony from the investigating detectives revealed that Vincent Powers was found walking within a few blocks of the O'Mearas' home in the early hours of the morning and that he was nervous and sweating when approached by the officers. (Tr. 858-7.) When Powers was taken to the O'Mearas' home for identification, Mrs. O'Meara positively identified him as the man she saw in her home.
Ante, 8-9. From this circumstantial evidence, the majority concludes that "the evidence is sufficient to support Powers' burglary conviction." I could not disagree more.
 {¶ 35} The facts from which the majority concludes that defendant intended to commit a theft at the O'Meara home do not preclude other reasonable theories of defendant's intent. "An appellate court will reverse a conviction based solely on circumstantial evidence where that evidence does not, as a matter of law, preclude all reasonable theories of innocence." State v.Jacobozzi (1983), 6 Ohio St.3d 59, 61, 451 N.E.2d 744.
 {¶ 36} In the case at bar, the O'Meara dog's barking does nothing to establish that defendant entered the O'Meara home with an intent to commit any crime. Even if the dog were barking, which event defendant denied, that fact says nothing about defendant's intent. Connecting the dog's barking to defendant's departure does not establish an intent to commit a crime. That the barking may have frightened him or even just discouraged him from remaining does not imply an intent different from that of any one else in such circumstances. Such evidence falls far short of convincing "the average mind of defendant's guilt beyond a reasonable doubt." City of Brooklyn v. Fouche, Cuyahoga App. No. 85510, 2006-Ohio-169, ¶ 29, citing State v. McSwain,
Cuyahoga App. No. 83394, 2004-Ohio-3292, ¶ 10, citing State v.Jenks (1991), 61 Ohio St.3d 259, 273, 574 N.E.2d 492.
 {¶ 37} Second, the majority focuses on the fact that when defendant was approached by police he appeared "nervous and sweating." As with the barking dog, there are reasonable explanations why defendant may have appeared nervous and was sweating, explanations other than that he intended to commit a theft inside the O'Meara home.
 {¶ 38} Tanya O'Meara testified that after the dog barked defendant ran away from the premises. She also described defendant as a heavy-set person. Defendant described his own frame as being around 300 pounds. Contrary to the majority's conclusion, defendant could have appeared nervous because he realized his mistake in entering the O'Meara home or he could have been afraid of the dog, or both. Moreover, sweating is not an unusual event when someone has been walking fast, especially someone as full-figured as defendant. That defendant was "nervous and sweating" after he left the O'Meara home and the fact that Tanya O'Meara identified him do not establish beyond a reasonable doubt defendant's intent to commit a crime.
 {¶ 39} A broader review of the record demonstrates the inconclusive nature of the evidence.
 {¶ 40} Tanya O' Meara described the events on September 11, 2004:
Q: Does anything unusual happen about 4:30 that morning?
A: Yeah. As I was listening to the radio, I had heard the click of the screen door.
* * *
Q: Did you recognize the sound of that door?
A: Yes, immediately.
Q: What was your reaction when you heard that sound?
A: Well, it scared me because I knew it was the door and how late it was, and it certainly wasn't anyone I knew coming over that late.
* * *
Q: Were you able to see anything from your vantage point at that time?
A: No.
Q: Okay. So how long — how long of a period would you say it was until you figured out what was creating the sound?
A: Maybe like five or ten seconds, which I thought was odd too because I knew it was the screen door.
* * *
Q: You hear the sound; five or ten seconds go by. What do you do?
A: I got up from the couch.
Q: What did you observe as you got up from the couch?
A: Someone coming into the door.
Q: That person who was coming in the door, what did that person look like?
A: African-American, heavier-set gentleman.
Q: Had you ever seen that person before?
A: No.
Q: What did you observe this person do?
A: Well, he stepped in, both of us just looked at each other for a moment.
* * *
Q: How far into your house did the person walk?
A: Maybe three steps.
* * *
Q: Did he say anything to you?
A: He did.
Q: What did he say?
A: He said: Is Dave here[?]
Q: What did you say?
A: I said: You have the wrong door.
Q: Then what happened?
A: Pretty much by that time, it woke my dog up, that was the only interaction. So a large dog shot out.
Q: What's your dog's name?
A: Chip.
Q: What kind of dog is [C]hip?
A: A German shepard [sic] mix.
Q: How big is he?
A: I think he weighs about 70 pounds.
Q: So he's a sizable dog?
A: He's pretty big.
Q: How did Chip enter the room?
A: In a hurry. He's got a big bark.
Q: Was Chip barking?
A: Yeah.
Q: What happened when Chip came in the room?
A: The man left, ran out the door.
* * *
Q: All right. Did Chip make it out the door too, your dog?
A: Actually, the screen door, I shut it —
Q: You shut the screen door?
A: Yeah. Like the guy like ran and shut it kind of behind him, slammed it, but I don't — I don't think the dog would have followed anyhow, but he did go up to the door.
Tr. 26-34.
 {¶ 41} On cross-examination, Tanya further testified as follows:
Q: Later you stated that he stepped three steps into the house. When you say he was coming into the door, was he just opening the screen door and peering in at first, or did he just like walk right into the house?
A: Walked right in. There was [sic] wasn't any peering.
That's why it kind of happened simultaneously.
Tr. 46.
 {¶ 42} Officer Mark Williams, one of the police officers to respond to John O' Meara's 911 call, confirmed that defendant had told Tanya that he was looking for someone named "Dave."
 {¶ 43} Defendant testified on his own behalf as follows. On September 11, 2004, defendant was staying with a friend who lived at 140th and Lorain Ave. on the West side of Cleveland. The parties agree that this location is near the area where the O'Mearas live. Defendant was waiting for a man named Dave to come by and repay a $20.00 loan. While he waited, someone came to the door and told defendant he knew where Dave lived. The two men walked approximately fifteen minutes when the other man pointed to what turned out to be the O'Meara home.
 {¶ 44} Contrary to Tanya's testimony, defendant said he walked to the front door of the house and knocked on the screen door, which rattled. Defendant knew someone was awake because he heard what he thought was a television. After five to ten seconds, defendant says he knocked again and Tanya came to the door. He asked her whether Dave was there. Tanya replied "you have the wrong door." Before defendant walked away, however, he remembers the O' Meara dog coming towards the door. To defendant, the dog was not as big as Tanya described and he does not recall the dog barking, but only heard it panting at the door.
 {¶ 45} Defendant also contradicted Williams' testimony that the condom that fell out of his pant leg was prepared for use. Defendant testified as follows:
Q: Okay. Can you explain or is there any explanation for why that condom fell out of the bottom of your sweatpants?
A: Yes. I had slept with a woman earlier in the evening and it might have stuck to my leg after use when I got up. Or it might have been in my pants leg —
Q: Okay. Did you know specifically how that happened or how that condom got there or are you guessing?
A: I'm guessing.
Q: Trying to come up —
A: It wasn't for use. It had been used.
Tr. 103-104.
 {¶ 46} Tanya O' Meara testified that before she heard her screen door click, she was sitting on the couch in her living room listening to music. O' Meara described the couch as sitting in front of but facing opposite her living room window. (State Exhibit 2.) The front door was to the right of the couch and parallel with the front window. The lights were on, the door was open, and the opaque drapes on the front window were drawn closed. As he stood on the porch, therefore, defendant could not, through either the window or the door, have seen anyone sitting on the couch.
 {¶ 47} Thus there is no evidence that defendant knew there was a female inside the house. Nor is there any evidence that defendant knew how many people were awake in the house before he stepped inside. Further, because the police discarded the condom without doing any testing on it, there is no evidence that the condom was ready to be used rather than already used as defendant claimed.[3]
 {¶ 48} As in Hillman, defendant in the case at bar was inside the home only a few steps and only a few seconds. While inside the house, defendant merely asked Tanya whether Dave was there. Defendant did not search for or take anything of value. Tanya told him he had the wrong house and defendant left. There is no evidence that defendant did or said anything indicating an intent to commit rape or theft.
 {¶ 49} The trial court's own comments acknowledge the inconclusive nature of the evidence:
They have presented evidence sufficient to prove that he intended to commit a criminal offense or theft offense, whether it was rape or robbery or whatever his intent was until he met the dog, who knows. * * * [T]here is no explanation why he went there[.]
Tr. 119-121. A rational factfinder could not find beyond a reasonable doubt that defendant intended to commit a rape or theft. Indeed, reasonable minds could have easily concluded that defendant was doing just what he claimed: he was looking for a man named Dave. Contrary to the majority's analysis, therefore, the evidence is insufficient to sustain a burglary conviction pursuant to R.C. 2911.12(A)(2).
 {¶ 50} I do not believe, however, that the court should have acquitted defendant of all charges under R.C. 2911.12.
 {¶ 51} When an indictment charges a defendant with an offense in which a lesser included offense is included but not specified in the indictment, the defendant can be acquitted of the offense charged but nonetheless found guilty of the lesser included offense. Crim. R. 31(C).[4]
 {¶ 52} In the trial court in the case at bar, defendant did not raise the issue of whether he should have been convicted on a lesser included offense. Because defendant did not object, the record is reviewed for plain error.
 {¶ 53} "To constitute plain error, the error must be on the record, palpable, and fundamental, so that it should have been apparent to the trial court without objection." The explanation given by the court in the case at bar indicates a clear basis for convicting defendant on a lesser included offense of second degree burglary. State v. Dunlap, Cuyahoga App. No. 84440,2004-Ohio-6652, ¶ 34, citing State v. Tichon (1995),102 Ohio App.3d 758, 767, 658 N.E.2d 16.
 {¶ 54} "Under Crim.R. 52(B), `plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court.'" State v.Montgomery, Franklin App. No. 02AP-927, 2003-Ohio-2888, ¶ 10. A trial court has the authority to "modify a verdict pursuant to Crim.R. 33(A)(4) when elements of a lesser-included offense have been satisfied. See, also, State v. Reed (1981),65 Ohio St.2d 117, 123, 418 N.E.2d 1359; Crim.R. 33(A)(4) (providing that trial court may modify verdict without granting or ordering a new trial if evidence demonstrates defendant is not guilty of the degree of crime for which he was convicted, but guilty of a lesser degree, or of a lesser-included crime)." Id., ¶ 11.
 {¶ 55} A conviction on a lesser included offense is proper when the evidence presented at trial reasonably supports "both an acquittal on the crime charged and a conviction upon the lesser included offense." State v. Thomas (1988), 40 Ohio St.3d 213,216, 533 N.E.2d 286.[5]
The test to be applied when determining if a charge or instructions should be given on a lesser included offense is whether the jury could find against the state on an element of the crime charged, yet find for the state on the remaining elements which would be sufficient to sustain a conviction on a lesser included offense. If the jury can reasonably find that the state failed to prove one element of the charged offense beyond a reasonable doubt but that the other elements of the offense were proven beyond a reasonable doubt, thus sustaining a conviction on a lesser included offense, a charge on the lesser included offense is required. Miller, ¶ 55, citing State v. Houseman
(1990), 70 Ohio App.3d 499, 506, 591 N.E.2d 405, citing State v.Kilby (1977), 50 Ohio St.2d 21, 24-25, 361 N.E.2d 1336.[6]
 {¶ 56} The offense of burglary as defined in R.C.2911.12(A)(4), is a lesser included offense of the type of burglary defined in R.C. 2911.12(A)(2). Montgomery, supra, ¶ 12. R.C. 2911.12(A)(4), provides that "no person, by force, stealth, or deception, * * * shall trespass in a permanent or temporary habitation of any person when any person other than an accomplice of the offender is present or likely to be present." Unlike section (A)(2) of the burglary statue, the burglary defined in section (A)(4) does not require the specific intent to commit a crime, but merely requires trespass into another's habitation when another is present or likely to be present.
 {¶ 57} In the case at bar, while the evidence does not support a conviction for burglary as defined in R.C.2911.12(A)(2), it does, however, support a conviction for the lesser included offense of burglary set forth in R.C.2911.12(A)(4), a fourth degree felony.
 {¶ 58} The record demonstrates that defendant knew he did not have permission to simply walk into the O'Meara home regardless of whether he was looking for Dave. Defendant also knew that someone was at home because the lights and television were on. In entering a house he knew to be occupied by another, defendant committed the lesser offense of burglary as defined in R.C.2911.12(A)(4), a fourth degree felony, which has a different sentencing range.
 {¶ 59} I would sustain defendant's second assignment of error to a limited degree. I would vacate defendant's conviction and sentence for burglary under R.C. 2911.12(A)(2) and remand the case to the trial court to conduct a resentencing hearing for a conviction under R.C. 2911.12(A)(4).
[2] See also, State v. Nelson, Ashtabula App. No. 2002-A-0019, 2003-Ohio-5699, ¶ 35.
[3] Defendant testified that he had sex earlier on the 11th with "April."
[4] Crim.R. 31(C), in its entirety, reads as follows: (C) Conviction of lesser offense. — The defendant may be found not guilty of the offense charged but guilty of an attempt to commit it if such an attempt is an offense at law. When the indictment, information, or complaint charges an offense including degrees, or if lesser offenses are included within the offense charged, the defendant may be found not guilty of the degree charged but guilty of an inferior degree thereof, or of a lesser included offense.
[5] The statutory authorization for a conviction on a lesser included offense, not specified in an indictment, is found in R.C. 2945.74, which provides: "[w]hen the indictment or information charges an offense, including different degrees, or if other offenses are included within the offense charged, the jury may find the defendant not guilty of the degree charged but guilty of an inferior degree thereof or lesser included offense."
[6] "An offense is an `inferior degree' of the indicted offense where its elements are identical to or contained within the indicted offense, except for one or more additional mitigating elements. * * * An offense may be a lesser included offense of another if (i) the offense carries a lesser penalty than the other; (ii) the greater offense cannot, as statutorily defined, ever be committed without the lesser offense, as statutorily defined, also being committed; and (iii) some element of the greater offense is not required to prove the commission of the lesser offense." State v. Deem (1988), 40 Ohio St.3d 205,533 N.E.2d 294, at syllabus.